1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ALEX GONZALES, | Case No. 1:25-cv-00225-EPG-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ORDER DIRECTING CLERK OF COURT TO ASSIGN DISTRICT JUDGE |
| Respondent. | |

        Petitioner Michael Alex Gonzales is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

        On September 30, 2022, Petitioner was convicted by a jury in the Kern County Superior Court of second-degree murder, two counts of possession of a firearm, possession of ammunition, and misdemeanor resisting arrest. The jury also found true a firearm enhancement allegation. On December 1, 2022, Petitioner was sentenced to an aggregate imprisonment term of forty-three years and eight months to life. (3 CT[1] 743–46.) On December 19, 2023, the California Court of Appeal, Fifth Appellate District, remanded with instructions to correct the calculation of presentence custody and amend the abstract of judgment to reflect the correction,

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 5.)

and otherwise affirmed the judgment. <u>People v. Gonzales</u>, No. F085373, 2023 WL 8723956, at

*12 (Cal. Ct. App. Dec. 19, 2023). On February 21, 2024, the California Supreme Court denied

the petition for review. (LDs[2] 22, 23.)

On February 20, 2025, Petitioner filed the instant federal petition for writ of habeas

corpus, asserting the following claims for relief: (1) instructional error, in violation of due

process and Petitioner's right to present a complete defense; and (2) insufficiency of the evidence

to justify conviction for unlawful possession of a firearm. (ECF No. 1.) On March 18, 2025,

Respondent filed an answer. (ECF No. 6.) To date, no traverse has been filed, and the time for

doing so has passed.

## II.

### STATEMENT OF FACTS[3]

#### Testimony of Pompeyo "Popeye" DeLeon

On January 2, 2021, DeLeon and several other people were standing near a
storage unit behind an apartment complex in Bakersfield, California. DeLeon
worked at that apartment complex. DeLeon testified that defendant, known also as
"Kreeper," and Jesus Chavez, Jr., also known as "Jesse" approached DeLeon.
Defendant lifted his shirt to reveal a firearm with a clip. Defendant asked DeLeon,
"You know who I am?" DeLeon responded that he did. Defendant then said, "I'm
... the one who shot Lokito on Haley Street,"[4] and accused DeLeon of stealing his
Bluetooth speaker. DeLeon denied stealing the speaker, and defendant said he
was going to come back with the person who inculpated DeLeon.

Defendant and Chavez then started walking toward the street, and DeLeon ran
toward an alley. As DeLeon left, he could see defendant and Ruben Vega, who he
only knew as "Temper," arguing. As DeLeon entered the alley, he heard three
gunshots.

DeLeon testified that he did not know Vega personally but had seen him around
the apartments. DeLeon had asked a man named Joe, who lived in the front of the
apartments, about Vega. Joe had told DeLeon that Vega was staying with him for
a week or a couple weeks. When DeLeon would see Vega, he would see him at
Joe's apartment. Prior to the shooting, DeLeon testified that Vega had passed by
when defendant was talking to DeLeon. Once he saw DeLeon and defendant,
Vega returned to the front of the apartments.

DeLeon also gave a statement to Kern County Sheriff's Sergeant M. Chambless
on January 6, 2021. In that statement, DeLeon said that he saw Temper come out
of Joe's apartment the day of the shooting.

---

[2] "LD" refers to the documents lodged by Respondent on March 18, 2025. (ECF No. 5.)
[3] The Court relies on the California Court of Appeal's December 19, 2023 opinion for this summary of
the relevant facts. <u>See</u> <u>Vasquez v. Kirkland</u>, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[4] DeLeon testified that Lokito was DeLeon's brother-in-law and they were "kind of related."

*Testimony of Jesus "Jesse" Chavez, Jr.*

On February 8, 2021, Chavez was taken into custody on an outstanding warrant in an unrelated matter and spoke with Chambless about the shooting of Vega. Chavez told Chambless that "this fool named Kreeper ... he is the one that shot him ...."

Chavez stated that defendant got a ride from defendant's brother in a blue car with a sunroof top. Defendant had gotten out of the car "all pissed" because he thought "Popeye" had stolen his Bluetooth speaker. Defendant had a gun, but DeLeon denied taking defendant's speaker and walked away. That was when Vega showed up and started arguing with defendant.

Chavez described Vega appearing "out of nowhere." He said Vega did not come out of Joe's apartment because "we were just right there in the front, chilling" and Vega "just showed up." Chambless asked him if Vega came from the street or another apartment, and Chavez responded, "We don't know, everybody was just there we were like, 'what the hell?' "

Vega called defendant a "child molester," then pushed defendant and tried to run. Vega was trying to run around a truck, dodging defendant when defendant chased him and shot him. Chavez identified defendant from a photographic lineup after speaking with Chambless. At trial, Chavez identified defendant as the shooter, stating that defendant shot Vega because Vega called defendant a child molester.

*Defendant's Apprehension*

On February 8, 2021, a Kern County Sheriff's deputy was working undercover when he spotted defendant exit a blue Nissan Altima. Defendant then got back into the car and he and another individual drove away. A marked patrol car attempted to stop the vehicle, but it led officers on a short pursuit until it crashed into another vehicle.

Defendant was apprehended in a front yard west of the crash scene. Defendant was found carrying a glasses case that contained nine-millimeter and .22-caliber ammunition. Defendant alleged the case belonged to his brother, Andrew Gonzales, and that his brother had been armed with a firearm during the pursuit.

During a subsequent interview, defendant initially denied knowing anything about the shooting, or about arguing with Vega. He said that while his brother was prohibited from owning firearms his brother had purchased two guns, and was "always trying to stack up ... he's always getting in trouble for guns." However, defendant denied knowing there was a gun in his brother's car.

Ultimately, defendant admitted that he went with his brother and Chavez to confront someone he believed stole his speaker. Defendant said the day before Vega had threatened him with a gun, but defendant did not see a gun on Vega when defendant shot him. Defendant said he did not know what happened to the gun he used to shoot Vega, only that "[i]t just disappeared."

*Forensic Evidence*

At the scene of Vega's murder, officers found two spent ammunition casings, one from a nine-millimeter FC Luger, and one spent casing of an unspecified caliber.

At the scene of the accident where defendant was apprehended, officers found a handgun and a baseball cap outside the car. There was no testimony regarding the distance the gun was from the car, although the prosecution described the distance as "five, ten feet" outside the driver's door. Officers also found a loaded gun magazine in the center console of the car and a baggie of mixed, live ammunition comprised of nine-millimeter and .40-caliber rounds.

Vega suffered one gunshot which traveled through his right arm and into his chest. The bullet pierced both of Vega's lungs and his aorta, which caused profuse, rapid blood loss.

Gonzales, 2023 WL 8723956, at *2–3 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562

1   U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been

2   "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala,

3   576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is

4   reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

5          In ascertaining what is "clearly established Federal law," this Court must look to the

6   "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the

7   relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court

8   decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that

9   'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent

10  decisions"; otherwise, there is no clearly established Federal law for purposes of review under

11  AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742,

12  754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125,

13  123 (2008)).

14         If the Court determines there is clearly established Federal law governing the issue, the

15  Court then must consider whether the state court's decision was "contrary to, or involved an

16  unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A

17  state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at

18  a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state

19  court decides a case differently than [the Supreme Court] has on a set of materially

20  indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an

21  unreasonable application of[] clearly established Federal law" if "there is no possibility

22  fairminded jurists could disagree that the state court's decision conflicts with [the Supreme

23  Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state

24  court's ruling on the claim being presented in federal court was so lacking in justification that

25  there was an error well understood and comprehended in existing law beyond any possibility for

26  fairminded disagreement." Id. at 103.

27         If the Court determines that the state court decision was "contrary to, or involved an

28  unreasonable application of, clearly established Federal law," and the error is not structural,

1  habeas relief is nonetheless unavailable unless it is established that the error "had substantial and

2  injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

3  (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776

4  (1946)).

5       AEDPA requires considerable deference to the state courts. Generally, federal courts

6  "look through" unexplained decisions and review "the last related state-court decision that does

7  provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision

8  adopted the same reasoning." Wilson v. Sellers, 584 U.S. 122, 125 (2018). This presumption

9  may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on

10 different grounds than the lower state court's decision, such as alternative grounds for affirmance

11 that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

12      "When a federal claim has been presented to a state court[,] the state court has denied

13 relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that

14 the state court adjudicated the claim on the merits in the absence of any indication or state-law

15 procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a

16 decision on the merits and there is no reasoned lower-court opinion, a federal court

17 independently reviews the record to determine whether habeas corpus relief is available under

18 § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the

19 record is not *de novo* review of the constitutional issue, but rather, the only method by which we

20 can determine whether a silent state court decision is objectively unreasonable." Himes v.

21 Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court

22 record and "must determine what arguments or theories . . . could have supported, the state

23 court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

24 those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

25 Court." Richter, 562 U.S. at 102.

26 ///

27 ///

28 ///

1

**IV.**

2

**DISCUSSION**

3

**A. Instructional Error**

4

In his first claim for relief, Petitioner asserts that the trial court erroneously instructed the

5

jury with CALCRIM No. 3475, in violation of Petitioner's rights to due process, a fair trial, and

6

presentation of a complete defense. (ECF No. 1 at 5.[5]) This claim was raised on direct appeal to

7

the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned

8

decision. The claim also was raised in Petitioner's petition for review in the California Supreme

9

Court, which summarily denied the petition. As federal courts review the last reasoned state

10

court opinion, the Court will "look through" the summary denial and examine the decision of the

11

California Court of Appeal. See Wilson, 584 U.S. at 125.

12

In denying the instructional error claim regarding CALCRIM No. 3475, the California

13

Court of Appeal stated:

14

> Defendant argues there was no evidentiary basis for the trial court to give the
> CALCRIM No. 3475 instruction. Defendant argues the instruction was irrelevant

15

> and was highly prejudicial because it negated defendant's theory of imperfect
> self-defense. We find that substantial evidence supports giving the instruction,

16

> and any error was harmless.

17

> **A. Background**

18

> *CALCRIM No. 3475*

19

> During the jury instruction conference, the prosecution requested CALCRIM No.

20

> 3475:

21

> > "[PROSECUTOR]: I also think the Court should consider the right to eject
> > a trespasser since [defendant] had no right to be there.

22

> > "THE COURT: [Defense counsel]?

23

> > "[DEFENSE COUNSEL]: I would object to that because the evidence was

24

> > that Mr. Vega did not live there, I mean, so what right would he have to
> > eject a trespasser? So I don't think that applies.

25

> > "[PROSECUTOR]: A guest in a home has every right to be there. A guest

26

> > would be a friend of the individuals who live there.

27

28

[5] Page numbers refer to the ECF page numbers stamped at the top of the page.

> "[Defendant] was scaring everybody and threatening people. Mr. Vega comes around and is a friend of those people. He would have a right to eject a trespasser.

> "THE COURT: So you are referring to the alleged victim in this case as a lawful occupant of that property?

> "[PROSECUTOR]: Yes, your Honor."

The trial court then gave the CALCRIM No. 3475 instruction, which read:

> "The lawful occupant of a property may request that a trespasser leave the property. If the trespasser does not leave within a reasonable period of time and it would appear to a reasonable person that the trespasser poses a threat to the property or the occupants, the lawful occupant may use reasonable force to make the trespasser leave.

> " 'Reasonable force' means the amount of force that a reasonable person, in the same situation, would believe is necessary to make the trespasser leave.

> "If the trespasser resists, the lawful occupant may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property.

> "When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

> "The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable. If the People have not met this burden, you must find the defendant not guilty of murder and manslaughter."

During closing argument, the prosecution argued, in relevant part:

> "But I want you to consider [defendant], with a questionable criminal history, comes around, start[s] waving a gun around, starts threatening people, starts threatening Mr. Vega's friends at a place where he doesn't even live. This is their home. This is their apartment complex. This is where they stay, where they hang out, and he's coming over here waving a gun around and threatening people....

> "And when you see the pictures of Ruben Vega, he does not look like somebody you would bump in a hallway. Look at his ID. He's six feet tall. He's 240, 250 pounds, something like that. He's as big as I am. He's got tattoos on his face. And he doesn't like [defendant] coming in and throwing weight around that he doesn't deserve to throw around, and he confronts him, confronts him with the fact that he is not the person to be out there threatening people. [¶] ... [¶]

> "Now, there's a couple other jury instructions that I want to talk to you briefly about before we move on.

"The first is the right to eject a trespasser.

"Now, the way it was phrased it kind of seemed like you'd be analyzing it as though [defendant] was the one ejecting a trespasser, and that's really what the instruction was designed for, somebody's kicking somebody off their property, gets violent, and somebody gets hurt, and then you go after the landowner. All right, well, we need to know that landowner's rights. That's the way it was phrased.

"But I want you to look at the law that's there. A lawful occupant of property, somebody who gets to be there, gets to kick you out of their property if you don't get to be there.

"So who was the lawful occupant? Ask Jesus Chavez. The police did. Can Ruben go around there? Does he get to be there? Does he get to hang out with you guys?

"Yeah, he comes around. He hangs around with us. He's cool with us. He's cool with my family.

"Popeye, he gets to be there. All those people get to be there. But when [defendant] shows up with a loaded gun to make threats and to scare people, he doesn't get to be there.

"Now, would it have been better if Ruben Vega had approached him and said kind sir, if you would please vacate the premises, you are a trespasser here, things might have gone better, but Ruben Vega was ejecting a trespasser, somebody who didn't belong.

"Why is that important? Because Ruben Vega gets to do what he did. He gets to eject by pushing or by any level of reasonable force this interloper, this person who doesn't belong there, this trespasser. He gets to push him out of there. And you don't get to have a mitigation of your deliberate murder because you trespassed and you threatened people. [¶] ... Ruben Vega gets to be there. He gets to push [defendant] away, get out of here."

In closing argument, defendant responded:

"Now, the prosecutor mentioned instruction [CALCRIM No.] 3475, right to eject trespasser from real property.

"Well, you don't eject a trespasser by calling them a child molester, green-lighting them in front of 20 individuals, and pushing them. That's not how you just eject a trespasser.

"And this is happening on the street, a public thoroughfare. That's not his place. That's not his abode."

In rebuttal, the prosecution concluded:

"And at the same time [defendant is] claiming that Mr. Vega had no right to eject [defendant] from the property, [defendant is] also arguing that he was everybody's buddy there. He was their homie. He was their friend. Yeah, that gives him a right to eject a trespasser.

"Somebody breaks into your home while you're in making cucumber sandwiches, you expect your buddy in the front room to tell them to get out.

"Mr. Vega had every right to push him to the curb just like he did. [Defendant] set up his own situation. He put himself there, his wrongful conduct, and now the just and proper response."

***Self-Defense Instructions***

The trial court instructed the jury on imperfect self-defense as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.

"If you conclude that defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime.

"The difference between complete self-defense and imperfect self-defense depends on whether the defendant's beliefs in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense if:

"One, the defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;

"And, two .... [¶] ... the defendant actually believed that the immediate use of deadly force was necessary to defendant against the danger, but at least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

"In evaluating the defendant's beliefs, consider all of the circumstances as they were known and appeared to the defendant.

"A danger is imminent if when the fatal wound occurred the danger actually existed or the defendant believed it existed. The danger must seem immediate and present so that it must be instantly dealt with. It may not be merely prospective or in the near future.

"Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force.

"If you find that Ruben Vega threatened or harmed the defendant in the past, you may consider that information in evaluating the defendant's beliefs.

"If you find that the defendant knew that Ruben Vega had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs.

" 'Great bodily injury' means significant or substantial physical injury. It is an injury that is greater than minor and moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder.

"A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force.

"The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends."[6]

Defendant's theory of imperfect self-defense was based on Vega calling defendant a child molester in front of a group of people and pushing him, which defendant argued put him in immediate, life-threatening danger:

" 'You are a child molester,' that's what Ruben Vega, aka Temper, calls [defendant] to his face, a child molester, the single worst thing you could ever call another person, a child molester, a monster, reviled, hated, not worthy of life, and Ruben Vega calls him that out loud, in front of 20 people right there. 'You're a child molester.'

"Fear, anger, outrage, incredulousness, oh, my God, what is everyone thinking, sheer panic, sudden vulnerability. 'You're a child molester.' And with those very dangerous words, a big ol' target gets placed on [defendant's] back, a blazing bull's-eye placed squarely on his back. It was a green light to kill him or attack him. He had just been green lit.

"Temper didn't need a gun. He didn't need a knife. He didn't need his fists. He didn't need any of those things. His words, his battle cry, was the weapon. [¶] ... [¶]

"And after saying those very dangerous words, 'You're a child molester,' Temper pushes [defendant]. He pushes [defendant]. Temper is the first to apply physical force. Temper is the first to instigate with his words and with his body, by uttering that accusation then applying physical force."

### General Instructions

The jury was also instructed on CALCRIM No. 200, which in relevant part reads:

"Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

///

///

---

[6] The instructions are pursuant to CALCRIM Nos. 571, 3472, and 3474.

**B. Legal Standard**

We review de novo whether jury instructions state the law correctly. (*People v. Jackson* (2010) 190 Cal.App.4th 918, 923.) "When instructions are claimed to be conflicting or ambiguous, 'we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights.' [Citation.]" (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.) "We assume that the jurors are ' " 'intelligent persons and capable of understanding and correlating all jury instructions ... given.' " ' [Citation.] If reasonably possible, we will interpret the instructions to support the judgment rather than to defeat it. [Citation.] Instructional error affects a defendant's substantial rights if the error was prejudicial under the applicable standard for determining harmless error. [Citations.]" (*Ibid.*, italics omitted.)

" ' "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." ' [Citation.]" (*People v. Gomez* (2018) 6 Cal.5th 243, 313.)

"A party is entitled to a requested instruction if it is supported by substantial evidence. [Citation.] Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.] At the same time, instructions not supported by substantial evidence should not be given. [Citation.] 'It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]' [Citation.]" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049–1050, italics omitted.) "[T]he test is not whether any evidence is presented, no matter how weak. Instead, the jury must be instructed when there is evidence that 'deserve[s] consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people] could have concluded" ' that the specific facts supporting the instruction existed. [Citation.]" (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677, italics omitted.)

Generally, CALCRIM No. 3475 applies to cases in which the owner or occupant of property is charged with using excessive force to remove a trespasser. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 709 (*Johnson*).) "The principles set forth in CALCRIM No. 3475 might also apply when there is an issue of whether a trespasser had any right to defend himself against the use of force by the owner/occupant of the property. In general, if an owner/occupant lawfully uses force to defend himself against aggression by a trespasser, then the trespasser has no right of self-defense against the owner/occupant's use of force." (*Id.* at pp. 709–710, italics omitted.) This likewise applies to a defendant's claim of imperfect self-defense. (*People v. Watie* (2002) 100 Cal.App.4th 866, 878.)

**C. Analysis**

*i. Substantial evidence supports giving the CALCRIM No. 3475 instruction.*

Defendant argues evidence failed to support the CALCRIM No. 3475 instruction, because there was no evidence that Vega was a lawful occupant of the apartment complex or that the confrontation between Vega and defendant happened on private property. Defendant argues all evidence points to the shooting occurring in the public street. We disagree.

Based on the evidence presented in this case, a reasonable jury could find persuasive that Vega was a lawful occupant of Joe's apartment. DeLeon testified that Joe told him Vega was staying with Joe for a week or a couple weeks. Every time DeLeon would see Vega, it was around Joe's apartment. In a statement made to Chambless, DeLeon said on the day of the shooting, DeLeon saw Vega come out of Joe's apartment. These facts tend to support a finding that Vega was an invited guest or lawful occupant of the apartment, and therefore the apartment complex.

Defendant appears to argue that to be a lawful occupant, Vega must have actually lived in Joe's apartment. However, residency is legally distinct from lawful occupancy and confers different rights. For example, "California law declares to be justifiable, homicide committed in reasonable defense of habitation (... § 197; *People v. Gleghorn* (1987) 193 Cal.App.3d 196, 200), but it extends the presumption of 'a reasonable fear of imminent peril of death or great bodily injury' only to residents ( ... § 198.5)." (*People v. Silvey* (1997) 58 Cal.App.4th 1320, 1326 (*Silvey*).)

In *Silvey*, the defendant, who shot his friend's ex-boyfriend while in his friend's trailer, was found to be a lawful occupant of the trailer but not a resident. (*Silvey, supra*, 58 Cal.App.4th at p. 1327, fn. 3.) The defendant was a regular visitor – he had a key to the trailer, would shower there once a day and occasionally slept over. (*Id.* at pp. 1323–1324.) The trial court instructed the jury on CALJIC No. 5.40,[7] the right of an occupant to eject a trespasser, but no one suggested the defendant was a resident. (*Silvey*, at p. 1327, fn. 3.)

Similarly, in this case, substantial evidence supports the conclusion that Vega was either a regular visitor or a short-term occupant of Joe's apartment, and therefore a lawful occupant. For CALCRIM No. 3475 to apply, Vega need not be a resident.

Next, while the facts appear to indicate that the shooting happened on the public street, the facts also show Vega was not on the street when he pushed defendant. Although Chavez did not see Vega come out of Joe's apartment, Chavez told Chambless that "we were just right there in the front, chilling." Chavez's statement can reasonably be interpreted as Chavez was either at or near the front of Joe's apartment, when Vega confronted defendant. Chavez also told Chambless that after Vega pushed defendant, he tried to run. This implies that the confrontation ended in a different location from where it started.

The prosecution's use of the instruction was also limited to Vega pushing defendant. The prosecution argued, "And you don't get to have a mitigation of your deliberate murder because you trespassed and you threatened people. [¶] ... Vega gets to be there. He gets to push [defendant] away, get out of here." A reasonable jury could consider that Vega was attempting to eject defendant as a trespasser from the apartment complex to the public street – property where Vega was a lawful occupant. Therefore, evidence is sufficient to warrant giving the CALCRIM No. 3475 instruction.

### ii. Any error was harmless.

In evaluating for prejudice, "[t]he 'generally applicable California test for harmless error' is set forth in [*People v. Watson* (1956)] 46 Cal.2d 818." (*People*

---

[7] This instruction is the CALJIC corollary to CALCRIM No. 3475.

*v. Hendrix* (2022) 13 Cal.5th 933, 942.) "Under the *Watson* test, we deem an error harmless unless it is 'reasonably probable' the outcome would have been different in the absence of the error. [Citation.]" (*Ibid.*) This includes " ' "incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error ...." ' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) Likewise, "giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

Primarily, the jury in this case was instructed that "[s]ome of these instructions may not apply" and to "follow the instructions that do apply to the facts as you find them." If CALCRIM No. 3475 was irrelevant, for example if the jury found Vega was not a lawful occupant or Vega did not confront defendant on private property, the jury was directed to disregard the instruction. We presume that the jury followed the instructions given. (*People v. Sutic* (1953) 41 Cal.2d 483, 494.)

Defendant argues if irrelevant, the instruction was not harmless because it denied him his due process right to present a complete defense. Defendant argues it entirely negated his imperfect self-defense claim.

The prosecution argued, and the jury was instructed that "[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force." However, the prosecution posited that defendant cannot claim self-defense when Vega pushed him. Defendant, in turn, did not make that argument.

Defendant's imperfect self-defense claim rested on the claim that defendant believed Vega calling him a child molester "green-lit" defendant for imminent violence. In closing, defendant argued:

> " 'You're a child molester.' And with those very dangerous words, a big ol' target gets placed on [defendant's] back, a blazing bull's-eye placed squarely on his back. It was a green light to kill him or attack him.... Temper didn't need a gun. He didn't need a knife. He didn't need his fists. He didn't need any of those things. His words, his battle cry, was the weapon."

Although defendant argued Vega pushed him first, he did not argue that the physical contact put him in fear for his life – rather, Vega's words did. In the context of defendant's argument, the jury would not have considered CALCRIM No. 3475 when determining whether Vega's words led to defendant harboring an unreasonable belief that he was in imminent danger of being killed or suffering great bodily injury, and use of deadly force was necessary to defend against the danger.

Defendant also argues the length of the jury's deliberation is proof of the prejudicial impact of the error. Defendant argues that while the case is not factually complex, the jury deliberated for three days, requested legal definitions of " 'premeditated/premeditation,' " " 'willful' " and " 'deliberate' " and requested a readback of Chavez's testimony before reaching a verdict.

The jury in this case was tasked with making a challenging decision between first and second degree murder. The jury's questions show the jury struggled with premeditation and ultimately concluded that defendant committed second degree murder. Defendant's argument is mere conjecture. Nothing in the jury's questions

14

indicates the jury struggled with CALCRIM No. 3475 or its effect on the degree of murder in this case.

Finally, the evidence of defendant's guilt is overwhelming. The jury was instructed "[t]he right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends." The facts show Vega ran almost immediately after calling defendant a child molester and pushing him, thereby withdrawing. Vega's injuries indicate he was not facing defendant when he was shot, consistent with Chavez's testimony that Vega was running away from defendant, trying to "dodge" him. Defendant nonetheless chased Vega and shot him as Vega ran. In light of these facts, it is not reasonably likely that the outcome would have been more favorable to defendant, had the jury not been instructed on CALCRIM No. 3475.

Gonzales, 2023 WL 8723956, at *3–10 (footnotes in original).

A federal court's inquiry on habeas review is not whether the challenged instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." Middleton v. McNeil, 541 U.S. 433, 437 (2004). However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Id. The pertinent question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (internal quotation marks omitted) (quoting Cupp, 414 U.S. at 147). "It is well established that the [ailing] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147).

Petitioner argues that CALCRIM No. 3475 was an "inapplicable instruction" because Vega "had no possessory right that gave him legal authority to eject anyone as a trespasser" and "the shooting did not take place in private area" but rather "outside the complex, on the street." (ECF No. 1 at 5, 50.) The state court found that for "CALCRIM No. 3475 to apply, Vega need not be a resident" but rather "a lawful occupant," such as "a regular visitor or a short-term occupant." Gonzales, 2023 WL 8723956, at *8. "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court

1   sitting in habeas corpus." <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005). There was evidence

2   presented that Vega was a lawful occupant of Joe's apartment and thus, the apartment complex.

3   DeLeon testified that Joe told him Vega was staying with Joe for a week or a couple of weeks. (7

4   RT 417, 432.) During a police interview, DeLeon stated that on the day of the shooting DeLeon

5   saw Vega come out of Joe's apartment. (8 RT 592.)

6        In <u>Griffin v. United States</u>, 502 U.S. 46, 59 (1991), the Supreme Court upheld a general

7   guilty verdict where one of the possible bases of conviction, while legally valid, was not

8   supported by adequate evidence, reasoning:

9        Jurors are not generally equipped to determine whether a particular
         theory of conviction submitted to them is contrary to law—
10       whether, for example, the action in question is protected by the
         Constitution, is time barred, or fails to come within the statutory
11       definition of the crime. When, therefore, jurors have been left the
         option of relying upon a legally inadequate theory, there is no
12       reason to think that their own intelligence and expertise will save
         them from that error. Quite the opposite is true, however, when
13       they have been left the option of relying upon a factually
         inadequate theory, since jurors *are* well equipped to analyze the
14       evidence, see *Duncan v. Louisiana,* 391 U.S. 145, 157, 88 S.Ct.
         1444, 1451, 20 L.Ed.2d 491 (1968). As the Seventh Circuit has put
15       it:

16            "It is one thing to negate a verdict that, while supported by
              evidence, may have been based on an erroneous view of the
17            law; it is another to do so merely on the chance—remote, it
              seems to us—that the jury convicted on a ground that was
18            not supported by adequate evidence when there existed
              alternative grounds for which the evidence was sufficient."
19            *United States v. Townsend,* 924 F.2d 1385, 1414 (1991).

20  <u>Griffin</u>, 502 U.S. at 59–60.

21        The reasoning in <u>Griffin</u> supports the conclusion that even if there was no factual basis to

22  instruct the jury with CALCRIM No. 3475, e.g., because the incident occurred on the public

23  street rather than in the private apartment complex, the jury would disregard the instruction and

24  render said instruction harmless. The jury in Petitioner's case was instructed that "[s]ome of

25  these instructions may not apply, depending on your findings about the facts of the case" and to

26  "follow the instructions that do apply to the facts as you find them," (3 CT 618), and the Court

27  presumes that the jury followed this instruction. <u>See</u> <u>Weeks v. Angelone</u>, 528 U.S. 225, 234

28  (2000) ("A jury is presumed to follow its instructions." (citing <u>Richardson v. Marsh</u>, 481 U.S.

200, 211 (1987))). "Petitioner does not cite, and the Court did not locate, any clearly established law that constitutionally prohibits a trial court from instructing a jury with a factually inapplicable but accurate statement of state law." <u>Fernandez v. Montgomery</u>, 182 F. Supp. 3d 991, 1011 (N.D. Cal. 2016).

Petitioner also asserts the state court violated his right to present a complete defense by instructing the jury with CALCRIM No. 3475. "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) (quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984)). The Supreme Court has noted that "the cases in which we have invoked th[e] principle [of a criminal defendant's right to present a complete defense] dealt with the exclusion of evidence or the testimony of defense witnesses" and did not "involve[] restrictions imposed on a defendant's ability to present an affirmative defense," <u>Gilmore v. Taylor</u>, 508 U.S. 333, 343–44 (1993) (citations omitted). The Supreme Court in <u>Gilmore</u> rejected the argument that "confusing instructions on state law which prevent a jury from considering an affirmative defense . . . violate due process." <u>Id.</u> at 344. Therefore, the state court's denial of Petitioner's instructional error claim as violating his right to present a complete defense was not contrary to, or an unreasonable application of, clearly established federal law.

Moreover, the Court notes that the CALCRIM No. 3475 instruction did not prevent Petitioner from presenting his imperfect self-defense claim that Petitioner "believed Vega calling him a child molester 'green-lit' [Petitioner] for imminent violence." <u>Gonzales</u>, 2023 WL 8723956, at *9. Defense counsel started her closing argument with the following:

> "You are a child molester," that's what Ruben Vega, aka Temper, calls Mr. Gonzales to his face, a child molester, the single worst thing you could ever call another person, a child molester, a monster, reviled, hated, not worthy of life, and Ruben Vega calls him that out loud, in front of 20 people right there. "You're a child molester."
>
> Fear, anger, outrage, incredulousness, oh, my God, what is everyone thinking, sheer panic, sudden vulnerability. "You're a child molester." And with those very dangerous words, a big ol' target gets placed on Mr. Gonzales's back, a blazing bull's-eye placed squarely on his back. It was a green light to kill him or attack him. He had just been green-lit.

1
2

> Temper didn't need a gun. He didn't need a knife. He didn't need his fists. He didn't need any of those things. His words, his battle cry, was the weapon.

3    (10 RT[8] 752–53.) As noted by the California Court of Appeal,

4
5
6
7
8

> Although defendant argued Vega pushed him first, he did not argue that the physical contact put him in fear for his life – rather, Vega's words did. In the context of defendant's argument, the jury would not have considered CALCRIM No. 3475 when determining whether Vega's words led to defendant harboring an unreasonable belief that he was in imminent danger of being killed or suffering great bodily injury, and use of deadly force was necessary to defend against the danger.

9    Gonzales, 2023 WL 8723956, at *9. The jury was presented with evidence and arguments of

10   Petitioner's defense theory that Petitioner believed Vega calling him a child molester "green-lit"

11   Petitioner for imminent violence. The jury was instructed regarding imperfect self-defense, and

12   the jury would not have to consider CALCRIM No. 3475 with respect to Petitioner's theory that

13   Vega's words put Petitioner in fear for his life.

14        Based on the foregoing, the state court's denial of Petitioner's instructional error claim

15   was not contrary to, or an unreasonable application of, clearly established federal law, nor was it

16   based on an unreasonable determination of fact. The decision was not "so lacking in justification

17   that there was an error well understood and comprehended in existing law beyond any possibility

18   for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to

19   habeas relief on his first claim, and it should be denied.

20        **B.  Sufficiency of the Evidence**

21        Petitioner asserts that there was insufficient evidence to justify his conviction for

22   unlawful possession of a firearm. (ECF No. 1 at 7.) This claim was raised on direct appeal to the

23   California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned

24   decision. The claim was also raised in the petition for review, which the California Supreme

25   Court summarily denied. As federal courts "look through" summary denials and review "the last

26   related state-court decision that does provide a relevant rationale," Wilson, 584 U.S. at 125, this

27   Court will examine the decision of the California Court of Appeal.

28   ───────────────
     [8] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent. (ECF No. 5.)

In denying Petitioner's sufficiency of the evidence claims, the California Court of Appeal stated:

> Defendant argues there is insufficient evidence to support the possession of a firearm conviction in count 3. Defendant argues the gun was found on the street, no evidence was presented about where the gun was before it landed on the street, and no evidence was presented that defendant had access to or exercised any dominion or control over the gun. We find substantial evidence supports the conviction.
>
> ### A. Legal Standard
>
> In reviewing a judgment for substantial evidence, this court " 'must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) We "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "To entitle a reviewing court to set aside a jury's finding of guilt, the evidence of identity must be so weak as to constitute practically no evidence at all." (*People v. Braun* (1939) 14 Cal.2d 1, 5.)
>
> "Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state ... who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." (§ 29800, subd. (a)(1).)
>
> "A defendant possesses a weapon when it is under his dominion and control. [Citation.] A defendant has actual possession when the weapon is in his immediate possession or control. He has constructive possession when the weapon, while not in his actual possession, is nonetheless under his dominion and control, either directly or through others. [Citations.]" (*People v. Peña* (1999) 74 Cal.App.4th 1078, 1083–1084.)
>
> " 'Possession may be imputed when the contraband is found in a location which is immediately and exclusively accessible to the accused and subject to his dominion and control' [citation] or which is subject to the joint dominion and control of the accused and another. [Citations.]" (*People v. Francis* (1969) 71 Cal.2d 66, 71.)
>
> ### B. Analysis
>
> Sufficient evidence supports a finding that defendant had constructive possession of the gun in his brother's car.
>
> In *People v. Taylor* (1984) 151 Cal.App.3d 432 (*Taylor*), the defendant obtained the keys to his girlfriend's father's car without permission and took it. The car was reported missing, and officers spotted it the following day, occupied by two males. (*Id.* at p. 434.) As officers pursued the car, they saw a gun thrown from the passenger window into bushes. (*Ibid.*) The car was ultimately involved in an accident, the defendant fled the scene, and was later apprehended. (*Id.* at p. 435.)

The defendant was charged with, in relevant part, possession of a loaded firearm in public.[9] The appellate court affirmed the conviction, finding that although the defendant was the driver and the gun was thrown from the passenger side, it was thrown soon after the chase began and the defendant's driving represented "an unequivocal attempt to avoid capture." (*Taylor, supra*, 151 Cal.App.3d at p. 436.) The appellate court concluded there was sufficient evidence that the defendant had constructive possession of the firearm. (*Ibid.*)

In *People v. Miranda* (2011) 192 Cal.App.4th 398 (*Miranda*), the defendant was one of four occupants in a vehicle, which was suspected to have been involved in a shooting. Officers pursued the vehicle and witnessed objects being tossed out of the back windows of the vehicle, including pieces of a broken shotgun and live ammunition. (*Id.* at p. 404.) The vehicle ultimately crashed into a fence and the occupants fled. (*Ibid.*) When the defendant was apprehended, he said he was in the front passenger seat, did not know there were any firearms in the car, and did not know anything was being tossed out of the car. (*Id.* at pp. 404–405.)

The appellate court affirmed the defendant's possession of a firearm conviction. (*Miranda, supra*, 192 Cal.App.4th at p. 410.) The court found there was no dispute that the defendant was in the vehicle during the pursuit. (*Ibid.*) It could also be inferred that the shotgun was also in the vehicle because pieces of it were thrown out of the back windows. (*Ibid.*) The court concluded:

"[I]t stands to reason that the shotgun was in the [vehicle] before the attack at the gas station and the jury reasonably could have inferred [the] defendant and the others were aware of its presence. This, after all, was a shotgun not a handgun. The jury also was free to disbelieve [the] defendant's testimony that he was unaware of the shotgun. Sufficient circumstantial evidence exists from which the jury could infer that [the] defendant had at least joint dominion and control over the shotgun before it was tossed out of the car window." (*Id.* at pp. 410–411.)

In this case, a gun was found five to 10 feet outside the driver's door of defendant's brother's car. Defendant knew his brother had purchased two guns and was "always getting in trouble for guns." When defendant was apprehended, he said that his brother was armed with a firearm during the pursuit, although he later denied knowing there was a gun in the car. Defendant had live ammunition in a glasses case on his person, and a search of the car revealed a loaded magazine and a baggie of ammunition in the center console of the car. These facts present circumstantial evidence that defendant had at least joint dominion and control over the gun while he was in his brother's car.

Defendant argues *People v. Sifuentes* (2011) 195 Cal.App.4th 1410[10] (*Sifuentes*) supports his position that he did not constructively possess the gun in the car. In *Sifuentes*, the defendant was found in a motel room shared with two women and a man. (*Id.* at p. 1414.) The defendant was laying on the bed nearest the door, and the man was kneeling next to the farther bed. Officers found a loaded handgun under the mattress in the farther bed. (*Ibid.*)

The prosecution presented evidence that the defendant was a member of the same gang as the other man in the room, and that gang guns were " 'accessible' " to gang members " 'at most times.' " (*Sifuentes, supra*, 195 Cal.App.4th at pp. 1415, 1417.) The prosecution was not able to elicit any evidence on whether the

---

[9] Then, section 12031, subdivision (a).

1
2
3

defendant had actual access to the firearm, and there did not appear to be any evidence presented about whether the defendant even knew the firearm was in the room. (*Id.* at p. 1418.) The appellate court found that the evidence fell short of providing substantial evidence that the defendant had the right to control the firearm in this case. (*Id.* at p. 1419.)

4
5
6

However, *Sifuentes* is distinguishable on its facts. The case involved a shared motel room, where the defendant was found in a different part of the room from the gun. The gun was hidden under the far bed's mattress, not easily accessible. And the prosecution did not elicit evidence about whether the defendant knew the gun was in the room. (*Sifuentes, supra*, 195 Cal.App.4th at p. 1417.)

7
8
9

Circumstantial evidence in this case supports a finding that defendant was in the car with the gun, and knew the gun was there both because he knew his brother bought and possessed guns, and because he told officers his brother was armed during the pursuit. Just as in *Taylor* and *Miranda*, the evidence is sufficient to support a jury finding that defendant was in constructive possession of the gun while in his brother's car.

10

11    Gonzales, 2023 WL 8723956, at *10–12 (footnote in original).

12    The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a

13    court must determine whether, viewing the evidence and the inferences to be drawn from it in the

14    light most favorable to the prosecution, any rational trier of fact could find the essential elements

15    of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A

16    reviewing court "faced with a record of historical facts that supports conflicting inferences must

17    presume—even if it does not affirmatively appear in the record—that the trier of fact resolved

18    any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State

19    law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of

20    evidence that the Due Process Clause requires to prove the offense is purely a matter of federal

21    law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

22    Jackson "makes clear that it is the responsibility of the jury—not the court—to decide

23    what conclusions should be drawn from evidence admitted at trial. A reviewing court may set

24    aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact

25    could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011). No "particular form of

26    evidence is required to support the Court of Appeal's reasoning or the jury's verdict." Lucero v.

27    Holland, 902 F.3d 979, 992 (9th Cir. 2018). "Circumstantial evidence and inferences drawn from

28    it may be sufficient to sustain a conviction." Ngo v. Giurbino, 651 F.3d 1112, 1114 (9th Cir.

2011) (quoting <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995)). "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state decision was 'objectively unreasonable.'" <u>Cavazos</u>, 565 U.S. at 2. "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." <u>Id.</u>

A federal court's "job under AEDPA is to avoid a 'type of fine-grained factual parsing' that does not accord deference to either jurors or state courts, and instead to survey *any* possible fact in the record that could support, directly or circumstantially, the jury's conviction." <u>Lucero</u>, 902 F.3d at 992 (citing <u>Coleman</u>, 566 U.S. at 655). Here, there was evidence in the record that a firearm was found outside the driver's door of Petitioner's brother's vehicle, Petitioner stated that his brother was armed with a firearm during the pursuit, Petitioner had live ammunition in a glasses case on his person, and there was a loaded magazine and ammunition in the vehicle's center console. "Although the evidence presented at trial could yield an alternative inference, we 'must respect the exclusive province of the [jury] to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.'" <u>Long v. Johnson</u>, 736 F.3d 891, 896 (9th Cir. 2013) (alteration in original) (quoting <u>United States v. Archdale</u>, 229 F.3d 861, 867 (9th Cir. 2000)). "The jury in this case was convinced, and the only question under <u>Jackson</u> is whether that finding was so insupportable as to fall below the threshold of bare rationality." <u>Coleman</u>, 566 U.S. at 656. Moreover, "after AEDPA, we apply the standards of <u>Jackson</u> with an additional layer of deference to state court findings." <u>Ngo</u>, 651 F.3d at 1115 (internal quotation marks and citation omitted). Thus, under this "double dose of deference that can rarely be surmounted," <u>Boyer v. Belleque</u>, 659 F.3d 957, 964 (9th Cir. 2011), the state court's denial of Petitioner's sufficiency of the evidence claims was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

**V.**

**RECOMMENDATION & ORDER**

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

Further, the Clerk of Court is DIRECTED to randomly ASSIGN a District Court Judge to the present matter.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections, **no longer than fifteen (15) pages, including exhibits**, with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 4, 2025**          /s/ Erica P. Grosjean
                                    UNITED STATES MAGISTRATE JUDGE